IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACQUELINE BARNHARDT, | ) | 4:12CV3156 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER ON |
| v. | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT AND |
| OPEN HARVEST COOPERATIVE, | ) | MOTION TO STRIKE |
| | ) | |
| Defendant. | ) | |
| | ) | |

On July 10, 2012, Jacqueline Barnhardt filed a four-count complaint against Open Harvest Cooperative (Open Harvest). (See Notice of Removal, Ex. A, Compl., (hereinafter "Compl."), ECF No. 1-1.) Now before me are Open Harvest's motion for summary judgment, (ECF No. 27), and motion to strike certain exhibits submitted by Barnhardt in opposition to the motion for summary judgment, (ECF No. 36). My analysis of these motions follows.

## I.   MOTION TO STRIKE

Open Harvest moves to strike Barnhardt's exhibits numbered 1, 2B, 2C, 2G, 2K, 2O, 3, and 4, along with all references to those exhibits that appear in Barnhardt's brief. (See, e.g., Def.'s Mot. to Strike, ECF No. 36.) It also moves to strike "every paragraph in Plaintiff's Brief that does not contain the accurate pinpoint reference required by NECivR 56.1(b)(1)." (Id.) Barnhardt has not filed a timely response to Open Harvest's motion.

1

### A.    Exhibit 1

Exhibit 1 is a two-page document that appears to be a letter from Dearborn National to Abby Osborn, who is Barnhardt's attorney.  (See Pl.'s Index, Osborn Decl., Ex. 1, ECF No. 35-2.)  The exhibit is accompanied by a declaration signed by Osborn stating, "Attached hereto and marked Exhibit 1 is a true and correct copy of a letter I received 2/7/12 from Dierborn [sic] National."  (Id., Osborn Decl. ¶ 2, ECF No. 35-2.)

Open Harvest argues that Exhibit 1 must be stricken because it is inadmissible hearsay.  (Def.'s Br. in Supp. of Mot. to Strike at 2, ECF No. 37.)  Barnhardt offers Exhibit 1 as evidence that her "disability insurance coverages were 'terminated by her employer on July 31, 2011.'"  (Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 13, ECF No. 34.  See also id. at 18.)  Exhibit 1 does include statements to that effect, (see Pl.'s Index, Osborn Decl., Ex. 1, ECF No. 35-2), but those statements are hearsay, see Fed. R. Evid. 801.  Barnhardt has not shown that an exception to the rule against hearsay applies or that the document otherwise merits consideration on summary judgment.  See Fed. R. Evid. 802; Fed. R. Civ. P. 56(c)(2), advisory committee notes, 2010 amendments ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").  Therefore, Exhibit 1 will be stricken from the summary judgment record.

I note parenthetically that Barnhardt's statement that her employer terminated her insurance on July 31, 2011, is supported by a citation to a second exhibit, (see Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. at 13, ECF No. 34 (citing, inter alia, Pl.'s Index, Osborn Decl., Ex. 2S, ECF No. 35-2)), and Open Harvest has not suggested that this second exhibit should not be considered in opposition to its motion for summary judgment.  Therefore, striking Exhibit 1 will have little practical

effect on my analysis of the summary judgment motion.

### B.    Exhibits 2B, 2C, 2G, 2K, and 2O

Open Harvest argues that Exhibits 2B, 2C, 2G, 2K, and 2O should be stricken because Barnhardt's brief contains no citations to these exhibits.  (Def.'s Br. in Supp. of Mot. to Strike at 3, ECF No. 37.  See also Pl.'s Index, Osborn Decl., Ex. 2, ECF No. 35-2.)   Federal Rule of Civil Procedure 56(c)(3) states that when analyzing a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record."  Although I shall not strike Exhibits 2B, 2C, 2G, 2K, and 2O, my attention is focused on the portions of the record that are properly cited in the parties' briefs.

### C.    Exhibit 3

Open Harvest argues that Exhibit 3, which appears to be a copy of an unnamed investigator's notes about a witness's interview, must be stricken because it is hearsay.  (See Def.'s Br. in Supp. of Mot. to Strike at 3-4, ECF No. 37.  See also Pl.'s Index, Osborn Decl., Ex. 3, ECF No. 35-2.)  I agree that the document is hearsay, and because Barnhardt has not shown that the document is admissible or otherwise suitable for consideration, Exhibit 3 will be stricken from the summary judgment record.   All references to the Exhibit that appear in Barnhardt's brief will be disregarded.

### D.    Exhibit 4

Exhibit 4 appears to be a copy of an email that was sent by Kelsi Swanson to a Mr. James Haszard on July 17, 2011.  Open Harvest argues that the document is hearsay.  (See Def.'s Br. in Supp. of Mot. to Strike at 5, ECF No. 37.)  I find that Exhibit 4 is hearsay, and Barnhardt has not shown that it is appropriate for me to consider this document in opposition to Open Harvest's summary judgment motion.

The document will be stricken, along with all references to it that appear in Barnhardt's brief.

### E.    Statements of Fact Lacking Pinpoint References

Citing Nebraska Civil Rule 56.1(b)(1), Open Harvest argues that Barnhardt's statements of fact must be stricken to the extent they are not accompanied by accurate citations "to affidavits, pleadings, discovery responses, deposition testimony . . . or other materials." (Def.'s Br. in Supp. of Mot. to Strike at 5, ECF No. 37 (quoting NECivR 56.1(b)(1)).)  Open Harvest's argument is well taken.  If Barnhardt's citations (or lack thereof) leave me unable to determine readily whether her statements of fact are supported by the summary judgment record, those statements of fact will be disregarded.  To the extent that Open Harvest's statements of fact are not properly supported, they also will be disregarded.

One final evidentiary issue merits attention.  Open Harvest has submitted a copy of the decision that was reached by the Commission on Human Rights following its investigation of Barnhardt's charge of discrimination.  (See Def.'s Br., Statement of Undisputed Material Facts ¶ 32, ECF No. 28 (citing Def.'s Index, Ex. 47, ECF No. 29-22).)  Barnhardt objects to my consideration of this document, arguing that it is irrelevant and that its unfair prejudicial effect outweighs its probative value.  (See Pl.'s Response Br., Response to Def.'s Statement of Facts ¶ 32, ECF No. 34.)  Open Harvest cites the document merely to show that the Commission "determined there was no reasonable cause to believe discrimination occurred," (Def.'s Br., Statement of Undisputed Material Facts ¶ 32, ECF No. 28), and I agree with Barnhardt that this general statement about the Commission's determination is not helpful at this stage of the proceeding.  Cf. Johnson v. Yellow Freight System, Inc., 734 F.2d 1304, 1309-10 (8th Cir. 1984) (explaining that the trial court has discretion to disregard EEOC

4

determinations).  Open Harvest submits that I should overrule Barnhardt's objection because she has not filed a separate motion to strike the document, (Def.'s Reply Br. at 7, ECF No. 28), but the form of Barnhardt's objection is not inconsistent with Federal Rule of Civil Procedure 56(c)(2).  See Fed. R. Civ. P. 56 advisory committee notes, 2010 amendments, subdivision (c)(2) ("There is no need to make a separate motion to strike.").

## II.   MOTION FOR SUMMARY JUDGMENT

Open Harvest argues that it is entitled to summary judgment on each count of Barnhardt's complaint, or, in the alternative, that it is entitled to partial summary judgment on the issue of damages.  (See generally Def.'s Br., ECF No. 28.) Barnhardt concedes the damages issue, (see Pl.'s Response Br. at 24, ECF No. 34), but otherwise resists Open Harvest's motion, (see generally id.)

### A.   Background[1]

Barnhardt is a 51 year-old female who suffers from an arteriovenous malformation (AVM) that affects her "cognition, memory, ability to compute, . . . and articulation," and also causes occasional seizures.  (Def.'s Br., Statement of Undisputed Material Facts (hereinafter Def.'s Facts) ¶ 1, ECF No. 28.)  Her condition was first diagnosed in December 2006.  (Id.)

Open Harvest is a member-owned retail cooperative located in Lincoln, Nebraska, that provides organic and natural foods to consumers.  (Id. ¶ 2.)  Barnhardt

---

[1] The facts summarized below are taken from the defendant's Statement of Undisputed Material Facts, (see Defs.' Br. at 3-9, ECF No. 28), the plaintiff's response to the defendant's statement of facts, (see Pl.'s Response Br. at 2-14, ECF No. 34), and the defendant's reply to the plaintiff's statement of facts, (see Def.'s Reply Br. at 3-7, ECF No. 38).

worked for Open Harvest from September 1994 until August 2, 2011. (Id. ¶ 3; Pl.'s Response Br., Response to Def.'s Statement of Facts (hereinafter Pl.'s Facts) ¶ 3(a), ECF No. 34.) At relevant times, she served as Open Harvest's Outreach and Membership Director, (Def.'s Facts ¶ 3), and she was earning $16.24 per hour (or $33,778.06 per year) at the time of her termination, (Def.'s Facts ¶ 30).

Kelsi Swanson began working for Open Harvest in September 2006. (Id. ¶ 4.) In January 2011, Swanson became Open Harvest's general manager and Barnhardt's supervisor. (Id.)

Swanson gave Barnhardt an annual performance review on February 2, 2011. (Id. ¶ 5.) Barnhardt's evaluation was "satisfactory," and she received a 3% raise in pay. (Id.; see also Def.'s Index, Ex. 44, Swanson Aff. Ex. 2, ECF No. 29-19.) Although most of Barnhardt's evaluation criteria are marked "Outstanding" or "Fully Satisfactory," the following criteria were marked "Needs Improvement": "Time Management"; "Balances friendliness with efficiency"; and "Gives constructive criticism–timely, specific, tactful." (See Def.'s Index, Ex. 44, Swanson Aff. Ex. 2, ECF No. 29-19.) Swanson informed Barnhardt that "she needed to improve on time management and the ability to give constructive criticism," gave Barnhardt "specific goals to achieve over the next three . . . to six . . . months," and told Barnhardt that her "performance and satisfaction of the specific goals" would be evaluated in six months. (Def.'s Index, Ex. 44, Swanson Aff. ¶ 4, ECF No. 29-19.) Sometime during February 2011, Barnhardt disclosed her AVM to Swanson. (Pl.'s Index, Barnhardt Aff. ¶ 7, ECF No. 35-1.)

Barnhardt states that on May 24, 2011, Swanson "blindsided" her about an unspecified matter by denying Barnhardt's request for a private meeting and instead "publically call[ing her] out" and embarrassing her. (Pl.'s Facts ¶ 7(a); Def.'s Index,

Ex. 43, Barnhardt Dep. at 132-133, ECF No. 29-18.)

On May 25, 2011, Swanson gave Barnhardt a warning for arriving late to work and taking a long lunch. (Def.'s Facts ¶ 6.)[2]  Swanson also "counseled" Barnhardt "for her verbal abuse of a co-worker, for making drug-related comments in public while on Open Harvest time and wearing Open Harvest attire, for delegating her primary responsibilities to others[,] and for lagging membership." (Def.'s Index, Ex. 44, Swanson Aff. ¶ 5, ECF No. 29-19.)  Barnhardt states that she expected the May 25 meeting to be a "3 month check in meeting," but instead Swanson took "disciplinary action" without giving Barnhardt an "opportunity to respond or provide the document she had prepared" for the meeting. (Pl.'s Facts ¶ 7(b).)  Barnhardt adds that sometime after the May 25 meeting, she told Open Harvest that she was not "shirking her responsibilities," but rather "cross-training other employees" because she was contemplating taking a medical leave. (See Pl.'s Facts ¶ 7(c)-(d).)[3]

On July 10, 2011, Swanson counseled Barnhardt "for sending an 'unproductive and rude' email to co-workers regarding their work on a membership drive." (Def.'s Facts ¶ 8.)  The email states,

> BJ,
>
> The signs for the membership drive look fine and they will work for the drive.  However, they do not coordinate with the text I sent.  In

---

[2] Barnhardt has submitted a document indicating that no employees were disciplined for violating Open Harvest's break policy during 2011. (See Pl.'s Facts ¶ 6(a) (citing Pl.'s Index, Osborn Decl., Ex. 5, Answer to Interrogatory No. 10, ECF No. 35-2).)  It is not clear why Barnhardt's warning was not mentioned in this document.  In any event, Barnhardt concedes that she received the warning. (See Pl.'s Facts ¶ 6.)

[3] It appears that Barnhardt made this statement during a meeting on May 31, 2011.  (Pl.'s Index, Osborn Decl. Ex. 2M, ECF No. 35-2.)

the future, can you please send me a draft before you finalize you [sic] signs for my department?  I would like for us to collaborate more closely on our projects.
Thanks.
Jackie

(Def.'s Index, Ex. 44, Swanson Aff. Ex. 9, ECF No. 29-19.)

On July 13, 2011, Swanson and Barnhardt held a "6-month check-in meeting," which was also "intended to be a follow-up to the May 25 written warning."  (Def.'s Facts ¶ 9.)  Swanson told Barnhardt that she was not happy with Barnhardt's job performance, but she was "willing to work with [her] on a Performance Improvement Plan ('PIP') with clear goals."  (Id.)  She instructed Barnhardt to submit her PIP on July 15, 2011, and warned her that her failure to "hit" the goals stated in the PIP would result in a request for her resignation.  (Id.)  There is evidence that Open Harvest imposed PIPs on two employees without disabilities (aged 39 and 40) at unspecified times, but these employees did not author the PIPs themselves.  (Pl.'s Index, Osborn Decl., Ex. 2L, ECF No. 35-2.)

Barnhardt attempted to discuss her medical condition during the July 13 meeting, but Swanson would not allow it.  (Pl.'s Facts ¶ 10 (citing Pl.'s Index, Osborn Decl., Ex. 2I, ECF No. 35-2).)[4]  Swanson told Barnhardt "that she was aware of the condition and accommodated it by allowing her to leave early and arrive late for

_____

[4] Open Harvest claims that Barnhardt mentioned her medical condition during the July 13 meeting, but did not ask for any accommodations.  (Def.'s Facts ¶ 10.)  It adds that Barnhardt's Exhibit 2I is identical to Open Harvest's Exhibit 15, and this exhibit "does not refute" Open Harvest's statements of fact.  (Def.'s Reply Br. at 3-4 and n.2.)  The documents are not the same, however, (compare Def.'s Index, Ex. 15, ECF No. 29-9 with Pl.'s Index, Osborn Decl., Ex. 2I, ECF No. 35-2 at CM/ECF p. 26-27), and Exhibit 2I does indicate that Swanson would not allow Barnhardt to discuss her medical condition during their July 13 meeting.

doctor appointments." (Def.'s Facts ¶ 10.)

On July 14, 2011, Barnhardt asked Swanson for time off to take a vacation. (Id. ¶ 11.) Because the request came "on the heels of the July 13 performance counseling," Swanson "did not react favorably" and denied the request. (Id.) Barnhardt states that she "would not have requested vacation" if she did not feel that she could "live up to [her] commitment about [her] job performance." (Def.'s Index, Ex. 43, Barnhardt Dep. at 159:3-6, ECF No. 29-18.)

On July 15, 2011, Barnhardt informed Swanson that she needed more time to prepare her PIP. (Def.'s Facts ¶ 12.) Barnhardt explained that she took her evaluation seriously and wanted "to present a thorough performance improvement plan that meets [Swanson's] approval," but she was not able to complete the plan in two days "[d]ue to numerous outreach commitments." (Def.'s Index, Ex. 10, ECF No. 29-7.) Barnhardt added that she would turn in the PIP on July 20, 2011. (Def.'s Facts ¶ 12.)

On July 20, 2012, Swanson gave Barnhardt a document titled, "Probation for Unsatisfactory Work Performance." (Def.'s Facts ¶ 13 (quoting Def.'s Index, Ex. 12, ECF No. 29-8).)[5] The document states that Barnhardt would be on probation for six weeks, and she was expected to improve her time management, her delegation of work to staff members, and her work on the tasks within her job description. (Def.'s

_____

[5] Barnhardt claims that on July 19, 2011, Swanson was informed that Barnhardt "would be soon requesting a leave of absence due to her medical issues." (See Pl.'s Facts ¶ 13(a)-(b).) Barnhardt has failed to cite evidence in the summary judgment record that supports this claim. (See id.) As noted previously, the record merely shows that on July 20, 2011, Open Harvest was aware that Barnhardt was contemplating a leave of absence at some unspecified time in the future. (See Pl.'s Index, Osborn Aff., Exs. 2M, 2N, ECF No. 35-2.)

Index, Ex. 12, ECF No. 29-8.)  Sometime during the same day, Barnhardt submitted her PIP.  (Def.'s Facts ¶ 13; Pl.'s Index, Osborn Decl., Ex. 2E, ECF No. 35-2.)  The PIP describes Barnhardt's role at Open Harvest, her plan to "evolve" her role, and the steps she had taken to address the concerns that had been presented to her since February 2011.  (Pl.'s Index, Osborn Decl., Ex. 2E, ECF No. 35-2.)  Specifically, the PIP states that Barnhardt had engaged in "weekly meetings with the Employee Assistance Program" to improve her time management, her "performance and attitude with [her] coworkers," and her excessive delegation of job responsibilities.  (Id.)  The PIP also states that Barnhardt was "seeking medical care to help job performance." (Id.)

Barnhardt was responsible for coordinating education programs about the history and philosophy of cooperatives for Open Harvest's employees and board members.  (Def.'s Facts ¶ 14.)  To discharge this responsibility, Barnhardt organized a discussion course that was to be held at an employee's house on Thursday evenings during an eight-week period.  (Id.)  During a session held on July 28, 2011, Barnhardt agreed with another attendee's statement that "the employees are the first to be sacrificed when the store is in financial trouble and have been asked repeatedly over the years to sacrifice more of their wages and benefits for the greater good."  (Def.'s Index, Ex. 46, Clark Aff., Ex. 42 at OH000163, ECF No. 29-21.)  Barnhardt added that Swanson and others "are from a Corporate background and this McDonald's way of management is what we have here."  (Id.)  Barnhardt then "deeply offended" Sherri Clark, who was also an Open Harvest employee, by criticizing something called "the EPIC Committee."  (Id. at OH000164.  See also Def.'s Index, Ex. 46, Clark Aff. ¶¶ 2-3, ECF No. 29-21.)  Barnhardt said that the committee was a "distraction to create things that make the staff feel good," but it "[wasn't] really doing anything."  (Def.'s

10

Index, Ex. 46, Clark Aff., Ex. 42 at OH000164, ECF No. 29-21.)  When Clark, who seems to have been somehow connected with the EPIC committee, expressed her feelings to Barnhardt, Barnhardt apologized and asked Clark "not to take her comment out of the room."  (Id.)

On July 29, 2011, Clark submitted a report to Swanson summarizing the events that occurred during the July 28 session.  (Def.'s Index, Ex. 44, Swanson Aff. ¶ 13, ECF No. 29-19.)  Later that day, Swanson asked Barnhardt about the statements that were attributed to her, and Barnhardt responded, "no comment."  (Id.)[6]  Swanson determined that Barnhardt had "engaged in unacceptable behavior" at the July 28 discussion session, and in light of the fact that Barnhardt was already on probation, Swanson decided to terminate Barnhardt's employment.  (Id. ¶ 14.)  However, Swanson did not actually terminate Barnhardt on July 29, 2011, because Swanson preferred to have Open Harvest's finance manager, Colleen Nygren, present when terminating employees, and Nygren was not working that day.  (Def.'s Facts ¶ 22.)

Sometime later on July 29, 2011, Barnhardt submitted a note to Swanson stating that she "will need to take a medical leave of absence" because she has "a serious health condition and [she is] finding it difficult to perform [her] job." (Def.'s Index, Ex. 17, ECF No. 29-11.)  The note also states that Barnhardt would be seeing doctors in Lincoln and Omaha, Nebraska, and she recently learned that she would "be going to the Mayo Clinic."  (Id.)  Barnhardt admits that she was not requesting leave on July 29; rather, she wanted to schedule a meeting on August 1, 2011, to discuss

_____

[6] Barnhardt admits that it is not appropriate for managers to make derogatory comments about management to subordinate employees, (Def.'s Facts ¶ 16), but she maintains that she did not (and does not) consider her comment about Swanson's corporate background to be derogatory, (Pl.'s Index, Barnhardt Aff. ¶¶ 3-6, ECF No. 35-1).

11

her need to take leave sometime in the future. (Def.'s Facts ¶ 21; Pl.'s Facts ¶ 21.) She emphasizes, however, that on July 29, 2011, Swanson was already aware that Barnhardt was suffering from AVM and was contemplating a medical leave of absence. (Pl.'s Facts ¶ 19(b)-(c). See also supra note 5.)

Barnhardt's last full day of work was July 29, 2011, (Def.'s Index, Ex. 45, Nygren Aff. ¶ 5, ECF No. 29-20), but there is evidence that she worked for two and one-half hours on July 30, 2011, (Pl.'s Index, Ex. 2Q at OH000352, ECF No. 35-2). She called in sick and did not report to work on August 1, 2011. (Def.'s Facts ¶ 24.) On August 2, 2011, Swanson and Nygren met Barnhardt when she arrived to work and informed her that she was being terminated for engaging in misconduct during her six week probationary period. (Id. ¶ 25.)

Open Harvest makes short term disability insurance available to its employees, but employees who desire this insurance pay the entire premium via payroll deduction. (Def.'s Index, Ex. 45, Nygren Aff. ¶ 3, ECF No. 29-20.) On August 3, 2011, Nygren sent an email to Lincoln Financial Management to determine whether Barnhardt's short term disability, long term disability, and life insurance coverage continued through the month of August. (Pl.'s Index, Osborn Decl. Ex. 2P, ECF No. 35-2; Def.'s Index, Ex. 45, Nygren Aff. ¶ 9, ECF No. 29-20.) Nygren's email states (incorrectly) that Barnhardt was terminated on August 1, 2011, and indicates that Nygren would like to continue Barnhardt's coverage "if possible." (Pl.'s Index, Osborn Decl. Ex. 2P, ECF No. 35-2.) Nygren received a response stating that disability and life insurance generally requires "active employment," and therefore coverage would "normally" terminate August 1. (Id.) The response continues, "If due to an arrangement you would keep her on your books as an active employee through the month of August, then it could go through August 31. If she has a claim

12

during August, it would be important that she would be an active employee.  Let me know how you want us to proceed."  (Id.)  Nygren replied, "No, she will receive 2 weeks severance, but will not be working.  So, I guess we need to terminate her enrollment."  (Id.)

Open Harvest deducted one half of the monthly premium for short term disability insurance from Barnhardt's August 1, 2011, paycheck, but it appears that Open Harvest did not pay the premium to the insurer.  (Pl.'s Index, Osborn Decl. Exs. 2S-2T, ECF No. 35-2.)  It did not refund this money to Barnhardt until December 27, 2011.  (Pl.'s Index, Osborn Decl. Ex. 2T, ECF No. 35-2.)

Barnhardt sent a claim for short term disability benefits to Dearborn National on September 15, 2011.  (Def.'s Facts ¶ 28.)  She states that she was not aware of the benefit before this date.  (Def.'s Index, Ex. 43, Barnhardt Dep. at 239, ECF No. 29-18.)  According to a letter dated October 17, 2011, Dearborn National denied Barnhardt's claim pursuant to a policy provision stating, in part, that coverage ends no later than the date employment terminates. (Def.'s Index, Ex. 40, ECF No. 29-15.)

Barnhardt received unemployment compensation until August 2012, and she ceased looking for employment at that time.  (Def.'s Facts ¶ 31.)  The parties agree that Barnhardt is unable to recover damages for back pay beyond the date that she "ceased receiving unemployment benefits."  (Pl.'s Response Br. at 24, ECF No. 34.)

On July 10, 2012, Barnhardt filed a four-count complaint against Open Harvest in the District Court of Lancaster County, Nebraska.  (See Compl., ECF No. 1-1.)  Count I alleges that Open Harvest violated the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq., by terminating Barnhardt on August 2, 2011, after she gave notice "that she would need to take qualifying medical leave."  (Compl. ¶ 38.)  Count II alleges that Open Harvest violated the Employee Retirement Income Security Act

13

of 1974 (ERISA), 29 U.S.C. § 1001 et seq., by "discharging and/or disciplining and/or discriminating against a participant for exercising her rights to health and disability insurance under the employee benefit plan and/or . . . [by] interfering with the attainment of her right under the plan." (Compl. ¶ 41.) Count III alleges that Open Harvest violated the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. § 12010 et seq., and the Nebraska Fair Employment Practice Act (NFEPA), Neb. Rev. Stat. § 48-1101 et seq., by subjecting Barnhardt "to increased scrutiny, disciplinary action, and termination based on her disability." (Compl. ¶ 44.)  Count IV alleges that Open Harvest violated the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., and the Nebraska Age Discrimination in Employment Act  (NADEA), Neb. Rev. Stat. §§ 48-1001 et seq., by treating Barnhardt "differently than similarly situated younger persons" and terminating her "based on her age." (Compl. ¶ 49.)

Open Harvest removed the action to this court on July 30, 2012, (see generally Notice of Removal, ECF No. 1), and it filed the instant motion on February 27, 2013, (see Mot. for Summ. J., ECF No. 27).

## B.   Standard of Review

"A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Id.  A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  See

also Jones v. Minnesota Dept. of Corrections, 512 F.3d 478, 481 (8th Cir. 2008).  In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, Anderson, 477 U.S. at 249.

It is the moving party's burden to establish that no genuine issue of material fact exists.  Fed. R. Civ. P. 56(a); Adickes, 398 U.S. at 157.  Therefore, if the moving party does not meet its initial burden, summary judgment must be denied even if no affidavits or other evidence have been submitted in opposition to the motion.  See Adickes, 398 U.S. at 159-60.  When the nonmoving party bears the burden of proof on a particular issue at trial, however, the moving party may be able to discharge its initial burden merely by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  After the moving party has met its burden, "the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." Singletary v. Missouri Dept. of Corrections, 423 F.3d 886, 890 (8th Cir. 2005).

### C.    Analysis

Open Harvest argues that it is entitled to summary judgment on all four counts alleged in Barnhardt's complaint.  (See generally Def.'s Br., ECF No. 28.)  I agree.

### 1.    Count I (FMLA)

"There are two types of claims under the FMLA: (1) 'interference' or '(a)(1)' claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges that the employer discriminated against him for exercising his

15

FMLA rights." Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008) (quoting Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006)) (internal quotation marks omitted). (See also Def.'s Br. at 11, ECF No. 28.) Open Harvest argues that it is entitled to summary judgment on Count I because Barnhardt cannot prove either type of FMLA claim. (Def.'s Br. at 11-16, ECF No. 28.)

I turn first to the question of whether Open Harvest is entitled to summary judgment to the extent that Barnhardt's FMLA claim is based on the "interference" theory. The FMLA prohibits employers "from interfering with, restraining, or denying an employee's exercise of or attempted exercise of any right contained in the FMLA." Stallings, 447 F.3d at 1050 (citing 29 U.S.C. § 2615(a)(1)). "Interference includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave'" or manipulating the terms and conditions of employment "'to avoid responsibilities under FMLA.'" Id. (quoting 29 C.F.R. § 825.220(b)). To state an interference claim, an employee must show that "she was entitled to the benefit denied," id. (quoting Russell v. N. Broward Hosp., 346 F.3d 1335, 1340 (11th Cir. 2003)), and that she had "given notice of her need for FMLA leave," Phillips, 547 F.3d at 909.

Significantly, "an employee can prove interference with an FMLA right regardless of the employer's intent." Stallings, 447 F.3d at 1050 (citation omitted). This does not mean that employers are strictly liable for interfering with an employee's FMLA rights, however. See id. at 1051. "[W]here an employer's reason for dismissal is insufficiently related to FMLA leave, the reason will not support the employee's recovery." Id. (citing Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 979-80 (8th Cir. 2005)). Put differently, "an employer who interferes with an employee's FMLA rights will not be liable if the employer can prove it would have

16

made the same decision had the employee not exercised the employee's FMLA rights." Blakley v. Schlumberger Technology Corp., 648 F.3d 921, 934 (8th Cir. 2011).

Open Harvest argues that Barnhardt's termination is "insufficiently related to FMLA leave" because "Swanson made the determination to terminate [Barnhardt] for misconduct that occurred at the July 28, 2011, discussion course," coupled with Barnhardt's "poor performance, counseling, and probation, all of which occurred before [Barnhardt] submitted her request for medical leave." (Def.'s Br. at 12, ECF No. 28.)  I agree.

When viewed in a light favorable to Barnhardt, the evidence could support a finding that Barnhardt satisfied FMLA's notice requirement on May 31, 2011, by signaling her intention to seek medical leave. See Phillips, 547 F.3d at 909-10; (Pl.'s Index, Osborn Decl. Ex. 2M, ECF No. 35-2).  Barnhardt's formal request on July 29, 2011, to discuss her need to take medical leave sometime in the future also satisfies the notice requirement.  There is no evidence, however, that Open Harvest ever refused to authorize FMLA leave for Barnhardt, discouraged her use of FMLA leave, or manipulated Barnhardt's job responsibilities in order to frustrate her ability to take FMLA leave.  At most, Swanson refused to allow Barnhardt to discuss her medical condition during a single meeting on July 13, 2011, when Swanson ordered her to prepare a PIP.  Moreover, the undisputed facts show that Barnhardt was terminated for job performance problems and misconduct, not for requesting an opportunity to discuss future medical leave.  In short, no reasonable trier of fact could conclude that Barnhardt was discharged, or otherwise denied substantive rights under the FMLA, because she wanted to discuss future FMLA leave with Open Harvest.

Because Barnhardt's FMLA claim is based on allegations that Barnhardt was

17

terminated for stating that "she would need to take qualifying medical leave," (Compl. ¶ 38), it seems to me that it "is fundamentally a retaliation claim and should be analyzed as such." Stallings, 447 F.3d at 1051. Because there is no direct evidence that Open Harvest discriminated against Barnhardt for asserting her rights under the FMLA, her retaliation claim must be analyzed under the McDonnell Douglas burden-shifting framework. Id. To establish a prima facie claim under this framework, Barnhardt must show that "1) she engaged in protected conduct; 2) she suffered a materially adverse employment action; and 3) the materially adverse action was causally linked to the protected conduct." Blakley, 648 F.3d at 934 (quoting Wierman v. Casey's Gen. Stores, 638 F.3d 984, 999 (8th Cir. 2011)). "If the plaintiff satisfies her prima facie showing, the employer 'must articulate a legitimate, non-retaliatory reason for its action.'" Id. (quoting Wierman, 638 F.3d at 999). "If the employer does so, the burden shifts back to the plaintiff to 'identify evidence sufficient to create a genuine issue of material fact whether [the employer's] proffered explanation is merely a pretext for unlawful retaliation.'" Id. (quoting Wierman, 638 F.3d at 999). "The ultimate question of proof—the burden of which remains on the employee throughout the inquiry—is whether the employer's conduct was motivated by retaliatory intent." Id. (quoting Wierman, 638 F.3d at 999).

Open Harvest argues that Barnhardt cannot establish the first or third elements of her prima facie case. (Def.'s Br. at 13, ECF No. 28.) I find that there is a genuine issue as to whether Barnhardt engaged in protected conduct on or before July 29, 2011, and therefore the first element of her prima facie case is satisfied. See Wierman, 638 F.3d at 999-1000. I also find that because Swanson terminated Barnhardt within four days of Barnhardt's formal request to discuss her need for future medical leave, the third element of her prima facie case is also satisfied. See

id. at 1000-01 (holding that employee's termination within a week of exercising FMLA leave was sufficient to meet the causation requirement).

Open Harvest also argues that it had legitimate, non-retaliatory reasons for terminating Barnhardt–specifically, her poor performance and misconduct. (Def.'s Br. at 15-16, ECF No. 28.)  I agree.  Indeed, the undisputed evidence shows that Barnhardt was warned about her poor job performance, directed to prepare a PIP, placed on probation, and found to have engaged in misconduct during the weeks preceding her termination.

It therefore falls to Barnhardt to establish that Open Harvest's reasons for terminating her are pretexts for unlawful retaliation.  Barnhardt attempts to meet this burden by arguing that Swanson escalated Barnhardt's disciplinary actions as her disability "became more apparent and the need for medical leave became imminent." (Pl.'s Response Br. at 22, ECF No. 34.)  This argument is not supported by the record.  As noted previously, there is evidence that on May 31, 2011, Barnhardt signaled to Open Harvest that she was considering taking medical leave at some unspecified future time.  Barnhardt was not allowed to discuss her medical condition during her July 13, 2011, meeting with Swanson; thus, it cannot be said that Swanson "escalated" her discipline because she learned something new about Barnhardt's disability or her contemplation of leave.  Also, although Barnhardt's PIP states that she was seeking medical treatment to improve her job performance, it does not indicate that Barnhardt's disability was becoming more severe or that a medical leave was imminent.  Barnhardt offered no additional information about the severity of her condition or her need for medical leave until after Swanson decided to terminate her on July 29, 2011.  Even then, Barnhardt merely asked for an opportunity to discuss her need to take leave at some unknown future time.  In short, Barhardt has directed

19

me to no evidence of a relationship between Open Harvest's disciplinary actions and the information it obtained about the severity of Barnhardt's condition or the "imminence" of her request for leave.

Barnhardt also argues that the three other Open Harvest employees who have been discharged since June 24, 2011, all engaged in "illegal conduct," but Barnhardt was "allegedly terminated for engaging in a discussion group [and] using an actual example of a corporation." (Pl.'s Response Br. at 20, ECF No. 34.) Although it is true that Open Harvest terminated other employees for "Smoking Marijuana in Parking Lot of Store," "Skimming Cash from Register," and "Making Harassing and Derogatory Comments to other Staff," (Pl.'s Index, Osborn Decl. Ex. 2J, ECF No. 35-2), the record does not support Barnhardt's contention that she was terminated merely because she referred to Swanson's "McDonald's way of management" during a discussion group. As noted previously, there is no dispute that Barhardt's job performance became poor after February 2011 and that she repeatedly engaged in conduct deemed inappropriate by her employer. Furthermore, I fail to see how Open Harvest's reasons for terminating other employees show that Open Harvest's reasons for terminating Barnhardt are pretexts for unlawful retaliation. Evidence that drug use, theft, and harassment have led to terminations does not establish that these are the only legitimate grounds for termination from Open Harvest.

I find that Barnhardt has failed to come forward with evidence sufficient to raise a genuine issue as to whether Open Harvest's reasons for terminating her are mere pretexts for retaliation in violation of the FMLA. No reasonable jury could conclude, based on the evidence in the record, that Open Harvest's conduct was motivated by an intent to retaliate against Barnhardt for exercising FMLA rights. Open Harvest is therefore entitled to summary judgment on Count I of the complaint.

## 2.   Count II (ERISA)

Open Harvest argues that it is entitled to summary judgment on Count II because Barnhardt cannot show that she was entitled to short term disability benefits or that Open Harvest terminated her with the specific intent to prevent the insurer from paying the benefits.  (Def.'s Br. at 16, ECF No. 28.)

"According to § 510 of ERISA, an employer may not discharge a participant 'for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.'"  Kinkead v. Southwestern Bell Telephone Co., 49 F.3d 454, 456 (8th Cir. 1995) (quoting 29 U.S.C. § 1140).  There is no evidence that Barnhardt exercised any right under an employee benefit plan prior to her discharge; therefore, her ERISA claim must be based on an interference theory.[7]

"In the absence of direct evidence of an employer's deliberate interference with future benefits," § 510 interference claims are analyzed "using the McDonnell Douglas three-part burden-shifting analysis."  Fitzgerald v. Action, Inc., 521 F.3d 867, 871 (8th Cir. 2008).  Because there is no direct evidence of such interference in this case, Barnhardt "must make a prima facie showing [that Open Harvest] terminated [her] with the specific intent of interfering with [her] insurance benefits."  Id.  If Barnhardt establishes a prima facie case, the burden shifts to Open Harvest "to articulate a legitimate, nondiscriminatory reason for the termination." Fitzgerald, 521 F.3d at 871.  If Open Harvest satisfies this burden, Barnhardt must prove that the

---

[7] Barnhardt argues that her "utilization of short-term disability benefits was a motivating factor in the Defendant's decision to terminate" her, (Pl.'s Response Br. at 16, ECF No. 34), but this argument is flatly contradicted by the record.

reason was pretextual.  Id.

Barnhardt theorizes that Open Harvest violated ERISA by withholding money from her final paycheck to pay the premiums for her short term disability "and other insurance policies," and then failing to make the premium payment to the insurer. (Pl.'s Response Br. at 17, ECF No. 34.)  She adds that Open Harvest terminated her coverage prior to her discharge, "provided false information to [its] financial manager who then relayed that information to the insurance carrier," and failed to take "technical steps . . . to continue coverage" for Barnhardt, all in violation of ERISA. (Id. at 17-18.)

The undisputed facts establish, however, that Barnhardt was not eligible for short term disability benefits after her termination on August 2, 2011, and although Open Harvest mistakenly deducted one half of the monthly premium for short term disability benefits from Barnhardt's last paycheck, it eventually refunded that amount to Barnhardt.  Furthermore, even though Open Harvest did inform the insurer that Barnhardt was terminated on August 1, 2011, when in fact she was terminated on August 2, 2011, this error had no connection with the insurer's decision to deny Barnhardt's claim for benefits.  Indeed, Barnhardt admits that she did not make her claim until September 15, 2011; thus, it cannot be said that Open Harvest's misstatement of Barnhardt's termination date interfered with her claim.  Relatedly, because Barnhardt did not make a claim for benefits until September 2011, Open Harvest's decision not to take "technical steps" to continue her coverage through August 2011 had no causal relationship to the denial of her claim.  Open Harvest also notes, correctly, that because Barnhardt was responsible for paying the full amount of the premiums for the short term disability policy, it had no financial incentive to prevent her from using the benefit.  (See Def.'s Br. at 18, ECF No. 28.)

In short, there is no evidence that Open Harvest took any action that was intended to frustrate Barnhardt's application for benefits. Because Barnhardt has failed to establish even a prima facie case of interference in violation of ERISA § 510, Open Harvest is entitled to summary judgment on Count II.

**3.    Count III (ADA and NFEPA)**

As there is no direct evidence that Barnhardt suffered disability-based discrimination, her ADA claim must be analyzed under the familiar McDonnell Douglas framework. See Ryan v. Capital Contractors, Inc., 679 F.3d 772, 776-77 (8th Cir. 2012). To establish a prima facie case under the ADA, Barnhardt must show 1) that she was disabled within the meaning of the ADA, 2) that she was qualified to perform the essential functions of the job with or without reasonable accommodation, and 3) that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. See id. at 777; see also Brown v. City of Jacksonville, 711 F.3d 883, 888 (8th Cir. 2013). After Barnhardt establishes a prima facie case, the burden shifts to Open Harvest to articulate a legitimate, nondiscriminatory reason for taking adverse employment actions against Barnhardt; if it does so, the burden shifts back to Barnhardt to establish that Open Harvest's reason is a pretext for unlawful discrimination. Ryan, 679 F.3d at 777.

Open Harvest argues that Barnhardt cannot establish the second element of her prima facie case "because she was not qualified to perform the essential functions of the position she held." (Def.'s Br. at 19, ECF No. 28.) Barnhardt does not resist this argument, (see generally Pl.'s Response Br., ECF No. 34), and I find it to be persuasive. The undisputed evidence shows that Open Harvest identified deficiencies in Barnhardt's performance and communicated those deficiencies to her on a number of occasions, but Barnhardt's performance remained unsatisfactory.

23

Furthermore, as explained above in Part II.C.1., Open Harvest has come forward with legitimate, nondiscriminatory reasons for disciplining and terminating Barnhardt, and Barnhardt has failed to satisfy her burden of demonstrating that these reasons are pretexts. (See Pl.'s Response Br. at 18-23, ECF No. 34 (arguing that the same evidence establishes pretext in connection with Barnhardt's FMLA and ADA claims).) Open Harvest is entitled to summary judgment on Barnhardt's ADA claim.

Open Harvest argues that its arguments apply with equal force to Barnhardt's NFEPA claim. (See Def.'s Br. at 19 n.3, ECF No. 28.) This argument is well-taken. See Ryan, 679 F.3d at 777 n.3. For the reasons set forth above, Open Harvest is entitled to summary judgment on Barnhardt's claim that she suffered disability-based discrimination in violation of the NFEPA.

### 4.   Count IV (ADEA and NADEA)

Once again, because there is no direct evidence that Open Harvest discriminated against Barnhardt on the basis of her age, her ADEA claim will be analyzed under the McDonnell Douglas framework described previously. To establish a prima facie case under the ADEA, Barnhardt must show 1) that she is over 40, 2) that she was qualified for the position, 3) that she suffered an adverse employment action, and 4) that circumstances permit an inference of discrimination (e.g., substantially younger, similarly-situated employees were treated more favorably). See Onyiah v. St. Could State Univ., 684 F.3d 711, 719 (8th Cir. 2012); Bearden v. International Paper Co., 529 F.3d 828, 831 (8th Cir. 2008). If Barnhardt establishes a prima facie case, Open Harvest must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Onyiah, 684 F.3d at 719. If Open Harvest meets this burden, Barnhardt must show that Open Harvest reason is a pretext. Id.

24

Open Harvest argues that Barnhardt cannot establish a prima facie case because she "failed to meet Open Harvest's legitimate expectations and engaged in misconduct while on a six . . . week probationary period," and because she "possesses no probative evidence to create an inference of discrimination." (Def.'s Br. at 22, ECF No. 28.) Barnhardt offers no response to Open Harvest's argument that she was not meeting her employer's expectations. (See Pl.'s Response Br. at 23-24, ECF No. 34.) She does argue, however, that two specific circumstances permit an inference of discrimination. (See id.) First, she submits that she was required to draft her own performance improvement plan while "her comparator" was not required to do so. (Id. at 24.) Second, she states, "Swanson's dissatisfaction with the Plaintiff's polite and appropriate request to collaborate as referenced in the July 10, 2011 email discussion highlights Swanson's impression of the older Plaintiff compared to the younger B.J.   Swanson's response to the Plaintiff is purely evil, and really demonstrates the difference in how she views older employees interacting with younger employees."  (Id.)[8]

I doubt whether Open Harvest's decision to require Barnhardt to draft her own performance improvement plan despite drafting the PIPs for younger employees itself is sufficient to permit an inference of discrimination.  Similarly, although I agree that Swanson's dissatisfaction with Barnhardt's email to "BJ" is puzzling, it is difficult to perceive a connection between Swanson's response to the email and Barnhardt's age.

In any event, even if I assume for the sake of argument that Barnhardt has

---

[8] I take it that Barnhardt is referring here to the email that Swanson found to be "unproductive and rude" on July 10, 2011.  (See Def.'s Facts ¶ 8; Def.'s Index, Ex. 44, Swanson Aff. Ex. 9, ECF No. 29-19.)

established a prima facie case of age discrimination, Open Harvest has come forward with legitimate, nondiscriminatory reasons for the adverse actions it took against Barnhardt, and Barnhardt has failed to show that these reasons are pretexts.  (See supra Parts II.C.1. and II.C.3; see also Def.'s Br. at 22-23, ECF No. 28; Pl.'s Response Br. at 23-24, ECF No. 34.)  Open Harvest is entitled to summary judgment on Barnhardt's ADEA claim.

Open Harvest argues that Barnhardt's NADEA claim should be analyzed "in conformity with" her ADEA claim.  (Def.'s Br. at 21 n.4, ECF No. 28 (citing, inter alia, Schultz v. Windstream Communications, Inc., 600 F.3d 948, 952 n.2 (8th Cir. 2010)).)  I agree.  Open Harvest is entitled to summary judgment on the NADEA claim for the reasons set forth above.

**IT IS ORDERED** that:

1.    The defendant's motion to strike, (ECF No. 36), is granted in part as explained in the memorandum accompanying this order; and

2.    The defendant's motion for summary judgment, ECF No. 27, is granted.

Dated May 22, 2013.

BY THE COURT

Warren K. Urbom
United States Senior District Judge

26